UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Donna M. DeClercq, individually
and as Personal Representative of
the Estate of Charles W. Powers,
Deceased,

          Plaintiff,

v.

Exelis Inc., Exelis Benefits
Administration Committee, Harris
Corporation, The Exelis Salaried
Retirement Plan, (f/k/a ITT
Salaried Retirement Plan), and
Harris Corporation Employee
Benefits Committee,

          Defendants.

_____/

Case No. 17-cv-10811

Judith E. Levy
United States District Judge

Mag. Judge David R. Grand

# OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS [15]

Before the Court is defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6). Plaintiff alleges that defendants breached their fiduciary duty under 29 U.S.C. § 1132(a) ("Section 502(a)") of the Employee Retirement Income Security Act ("ERISA"). Defendants argue that plaintiff is barred

from bringing a breach of fiduciary duty claim under ERISA. For the reasons set forth below, defendants' motion is granted.

I. **Background**

Plaintiff Donna M. DeClercq's deceased husband, Charles Powers, was an employee of ITT Corporation since 1983. (Dkt. 12.) ITT Corporation and its various stakeholders decided to offer an employee benefit plan ("the Plan").[1]

A. **The Plan's Post-Retirement Spouse's Annuity Options**

Under the Plan's default spouse's annuity structure, after retirement, Mr. Powers would receive 90% of his benefits under the Plan, and after his death, plaintiff, as his surviving spouse, would receive 50% of his benefits for the remainder of her life (the "90/50 Default Spouse's Annuity"). (Dkt. 12-2 at 49.) He also could elect to change the ratio to 80/80 (the "80/80 Spouse's Annuity Option") which would have provided

---

[1] In 2011, defendant Exelis, Inc. ("Exelis") succeeded ITT Corporation. (Dkt. 12 at 6.) Defendant Exelis Benefits Administrative Committee became the Plan's fiduciary and renamed the Plan the Exelis Salaried Retirement Plan in 2011. (Dkt. 12 at 6.) Exelis is wholly owned by defendant Harris Corporation, and in 2015, defendant Harris Corporation Employee Benefits Committee became the administrator of the Plan. (Dkt. 12 at 6.) Harris renamed the Plan the Harris Corporation Salaried Retirement Plan in 2017. (*Id*.)

plaintiff with greater post-death benefits than the default option. (*Id.* at 50.)

The Plan outlines the requirements for a participant who wishes to convert their automatic 90/50 Default Spouse's Annuity into the 80/80 Spouse's Annuity Option. (*Id.*) It specifies that any such election must be completed on a Plan-approved form and within a time frame specified in the Plan. (Dkt. 12-2 at 53.)

Further, the Plan gives the administrator authority to require additional information from a participant to establish his or her rights and benefits. (*Id.* at 73.) These subsections, as well as those providing discretionary authority to defendants to administer the Plan (*id.* at 93), are significant in this case.

### A. Mr. Powers' Divorce and Subsequent Marriage

When Mr. Powers began working for ITT and became a member of the Plan, he was married to Deborah Powers. (Dkt. 12 at 9.) On May 23, 1995, the Powers' marriage ended with a divorce judgment entered by the St. Clair County, Michigan court. (*Id.*) The divorce judgment stated that Deborah Powers would be awarded an interest in Mr. Powers' plan benefits pursuant to a Qualified Domestic Relations Order ("QDRO")

containing specific terms set forth in the divorce judgment, including that Deborah Powers would receive a portion of the surviving spouse annuity benefit. (Dkt. 12-5 at 5–6.) It is undisputed that the QDRO did not actually exist, nor was it even drafted or submitted to a court, ITT, Exelis, or any Plan administrators before August 2015. (*Id.*) Plaintiff also alleges Mr. Powers either did not know or did not understand until much later in the process, as late as July 2015, that he was required to have a QDRO in place under the terms of his divorce judgment and before his retirement benefits could be finalized. (*Id.*)

Mr. Powers and plaintiff married in 1997. (*Id.*)

**B. Mr. Powers' Attempt to Retire and Elect the 80/80 Spouse's Annuity Option**

Plaintiff alleges that as early as 2014, Mr. Powers expressed an intent to retire, set his Annuity Starting Date on June 1, 2015, and elected the 80/80 Spouse's Annuity Option. (Dkt. 12 at 10–11.) Plaintiff also claims that Mr. Powers relied on the Summary Plan Description ("SPD") for the procedure required to elect retirement benefits. (*Id.*) The SPD provided that first, participants were to log into BenefitsWeb to request estimates of benefits at an anticipated retirement date. (Dkt. 12-3 at 62.) Then, they were to request a "Kit," which is the Benefits

4

Administration Committee-approved form for commencing benefits required under the Plan. (*Id.*)

The timing in the SPD is specific: "[t]he Benefit Commencement Kit should be requested at least 30 days prior to your Annuity Starting Date, but no more than 90 days prior to your Annuity Starting Date." (*Id.*) Under this framework, with Mr. Powers' desired retirement date/Annuity Starting Date commencing on June 1, 2015, he needed to request his Kit after March 3, 2015, but no later than May 2, 2015. As set forth in further detail below, Mr. Powers never completed this step in accordance with the Plan's requirements.

Mr. Powers formally requested the Kit on March 14, 2015. (Dkt. 12-7.) Defendants did not send him the Kit. Instead, on March 24, 2015, the Exelis Benefits Center sent Mr. Powers a letter stating that it was "[a]ttempting to reach" him, and had been "unable to reach" him at that time. The letter requested that Mr. Powers call the Exelis Benefits Center "[a]t your earliest convenience." (Dkt. 12-8.) His[2] handwritten notes on the letter state, in relevant part "Copy of QDRO" and "Copy of

---

[2] The Court presumes this is Mr. Powers' handwriting, as it is construing the facts in the light most favorable to plaintiff at this stage in the litigation.

Divorce." (*Id.*) Defendants required Mr. Powers to submit an acceptable QDRO required by his divorce judgment before they would provide him with a Kit.

On April 10, 2015, Mr. Powers faxed Exelis Benefits Center a copy of his 1995 divorce judgment. (Dkt. 12–9 at 1.) His fax cover sheet states:

> This fax contains a copy of my divorce judgment with information on the QDRO terms. Also included is a copy of a letter from ITT Corporation with my accrued vested pension benefit information as of the time of the divorce settlement. I believe this is all of the information you requested to perform your calculation as we discussed in our telephone conversation on Monday April 5, 2015. Please let me know if you need anything more and I look forward to hearing back from you soon.

(Dkt. 12-9 at 1.)[3]

Plaintiff provided the Court with handwritten notes that indicate Mr. Powers spoke with defendants' representatives on May 5, 2015, and

---

[3] Plaintiff alleges that defendants did not know that Mr. Powers' divorce judgment even required a QDRO until defendants received a copy of it for the first time in April 2015. Thus, plaintiff argues that imposing a QDRO requirement before defendants had actual knowledge that a QDRO was required is arbitrary and capricious, which is addressed below. April 2015 was still within the window of time allowable under the Plan for requesting a Kit and making elections before his desired Annuity Starting Date, however, so this does not impact the outcome of the case.

again on May 28, 2015. (Dkt. 12-7 at 2.) Despite this, defendants did not send Mr. Powers the Kit, and were still waiting to receive his QDRO. On June 2, 2015, Mr. Powers spoke to another of defendants' representatives, who had been retained by defendants to review proposed QDROs. (Dkt. 12 at 15.) The representative told Mr. Powers that he needed to "provide a domestic relations order." (*Id.*)

The same day, Mr. Powers received an email from defendants' QDRO General Mailbox stating, "I have attached the procedures for a domestic relations order for the EXELIS salaried investment and savings plan and salaried retirement plan." (Dkt. 12-10 at 1.) The document attached to that email is a two-and-a-half page procedure for handling QDROs under the Plan. (*Id.*) The QDRO procedures document also states that an administrative hold is "placed on the Participant's applicable Plan benefits," and distribution of benefits "shall be restricted" during the hold period while awaiting a QDRO. (Dkt. 12-10 at 3.)

Mr. Powers' handwritten notes indicate that on June 17, 2015, a representative referred Mr. Powers to its outside QDRO consultant. (Dkt. 12-7 at 2.) Plaintiff alleges that this conversation was the first time Mr. Powers clearly understood that his 1995 divorce judgment that he faxed

7

to defendants in April 2015 did not satisfy defendants' QDRO requirement. (Dkt. 12 at 15.)

Mr. Powers retained an attorney to assist with setting up the QDRO on July 6, 2015. (*Id.*) Defendants still had not mailed Mr. Powers the Kit, so he had not yet triggered his Annuity Start Date, nor had he made the election for the 80/80 Spouse's Annuity Option.

### C. Mr. Powers' Death

A month later, in August 2015, Mr. Powers was hospitalized with a life-threatening disease. (Dkt. 12 at 16.) On August 4, 2015, while he was in the hospital, Xerox mailed Mr. Powers a letter stating that it had been retained by defendants to serve as its administrative QDRO consultant. (Dkt. 12-11.) The letter appears to be the first written document informing Mr. Powers that the 1995 divorce judgment "does not meet the requirements of a QDRO under the Internal Revenue Code Section 414(p) and ERISA Section 206(d)(3)." (*Id.*) The letter also stated:

> The plan cannot recognize your ex-spouse's interest in the plan, nor can the plan commence payments from the plan, until an order that meets the requirements of a QDRO is received… an administrative hold has been placed on the participant's benefit(s) which prevents distribution from the plan until this matter is

8

> resolved… We strongly suggest that you submit a draft order to us for pre-approval prior to submitting it to the court.

(*Id.*)

On August 6, 2015, Mr. Powers' attorney drafted a proposed QDRO and Mr. Powers signed it on August 9, 2015. (Dkt. 12 at 16.) It does not appear that Mr. Powers' attorney submitted the proposed QDRO to Xerox or defendants for pre-approval, as Xerox had suggested was required in its August 4, 2015 letter. Mr. Powers died on August 18, 2015.

### D. Communications After Mr. Power's Death

On October 22, 2015, the proposed QDRO was entered by the St. Clair County, Michigan court. (Dkt. 12 at 17.) On November 4, 2015, plaintiff spoke with one of defendants' beneficiary support specialists, who informed her that Mr. Powers' original benefits claim that he initiated via BenefitsWeb in March 2015 was rejected due to the lack of a QDRO. (Dkt. 12 at 17.) Therefore, Mr. Powers never officially retired, and his Annuity Start Date had never been triggered under the terms of the Plan. (*Id.*) If Mr. Powers wanted to retire, he would have to start the process over (*id.*), which was now impossible because Mr. Powers had

died nearly three months earlier. Thus, the only spousal benefit available to plaintiff became Mr. Powers' pre-retirement survivor's annuity. (*Id.*)

On February 22, 2016—four months after the proposed QDRO was entered by the St. Clair County court, Xerox mailed plaintiff's attorney a letter stating that Mr. Powers' QDRO was deficient. (Dkt. 12-14.)

Plaintiff believed that filing a claim for wrongful denial of benefits with defendants would be futile because Mr. Powers never received the Kit to initiate his Annuity Starting Date, and he could not do so now that he was deceased. (Dkt. 12-16 at 2.) She filed suit for breach of fiduciary duty under ERISA on March 14, 2017. (Dkt. 1.)[4, 5]

---

[4] The Court entered a stipulated order staying the case, and requiring plaintiff to exhaust the Plan's internal claims process. (Dkt. 7.) The internal claims process required plaintiff to participate in a process that she does not admit or believe addresses the remedy she seeks in this case. (Dkt. 12-16 at 2.) Despite this, plaintiff participated, and defendants made a final denial determination on her claim on March 22, 2018. (Dkt. 12-19.)

[5] On March 5, 2018, Conduent (previously known as Xerox) sent a letter to plaintiff's attorney informing him that an amended QDRO had not been received. (Dkt. 12-15 at 1.) The letter notified plaintiff's attorney that if an amended order was not received within sixty days of the March 5, 2018 letter, the administrative hold on payment of survivor benefits would be removed, and the entire pre-retirement survivor benefit payable with respect to Mr. Powers' plan would be made to plaintiff. (*Id.*) It appears the March 5, 2018 letter relates only to the level of benefits that plaintiff is eligible to receive as a surviving spouse of a non–retired employee.

## II. Legal Standard

When deciding a motion to dismiss under Rule 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## III. Applicable Law

Plaintiff seeks the following relief in this case. First, she seeks the monetary difference in survivor benefits that she would have received if Mr. Powers had validly elected the 80/80 Spouse's Annuity Option before he died. She argues that defendants breached their fiduciary duty under ERISA, which entitles plaintiff to relief. Second, she seeks reformation of the Plan. Finally, she argues that defendants acted arbitrarily and

capriciously under the Plan, and their decision to deny 80/80 Spouse's Annuity Option benefits should be reversed.

Plaintiff brought this case exclusively as a breach of fiduciary duty claim under ERISA § 502(a)(3). Under controlling Supreme Court law, a § 502(a)(3) claim is authorized only where § 502's other subsections do not provide a remedy. *See Varity v. Howe*, 516 U.S. 489, 515 (1996) (interpreting § 502(a)(3)'s provision for "appropriate" equitable relief to mean that "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'")

Section 502(a) states:

> A civil action may be brought…
>
> (1) by a participant or beneficiary… (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan, **or** . . .
>
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a) (emphasis added.)

There are circumstances where a plaintiff can bring a claim under both § 502(a)(1)(B) and § 502(a)(3), *see Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 615-16 (6th Cir. 1998); *and see Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 170, 718 (6th Cir. 2005), but that is not what plaintiff attempts here. Even so, if a claim brought under § 503(a)(3) could be adequately addressed under § 502(a)(1)(B) as a denial of benefits case (regardless of its merits), then the § 502(a)(3) claim must be dismissed. *Gore v. El Paso Energy Corp. Long Term Disability Plan*, 477 F.3d 833, 841 (6th Cir. 2007). The *Gore* test requires evaluation of the relief plaintiff seeks, and whether the remedies available under § 502(a)(1)(B) could apply. *Id.*

There are three distinct remedies available under § 502(a)(1)(B): "[1] to recover accrued benefits, [2] to obtain a declaratory judgment that [a participant or beneficiary] is entitled to benefits under the provisions of the plan contracts, and [3] to enjoin the plan administrator from improperly refusing to pay benefits in the future." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985). If the relief plaintiff seeks could

be redressed under one of these § 501(a)(1)(B) remedies, her § 503(a)(3) claim cannot proceed. *Gore*, 477 F.3d at 841.

### A. Monetary Difference in Benefit Amount

Plaintiff seeks the following relief for the monetary difference in the benefit amount:

- "surcharging" defendants for the amount of the benefits wrongfully denied;
- Disgorging defendants in the amount the plan was unjustly enriched for the wrongfully denied benefits;
- Disgorging the amount the defendants will be unjustly enriched in the future for the wrongfully denied benefits; and
- Granting other such equitable relief "as will restore the Plaintiff to the position she would occupy" if the 80/80 Spouse's Annuity Option had gone through.

In essence, the relief plaintiff seeks is money damages in the amount of the difference between what she receives currently under the Plan and the 80/80 Spouse's Annuity Option accrued from June 1, 2015 forward. This is the very type of relief that is cognizable under § 502(a)(1)(B)—the exact amount of money that is the difference between the 80/80 Spouse's Annuity Option and what she currently receives under the Plan.

Even though plaintiff labels the money damages she seeks as a "surcharge" and "disgorgement," (both of which would otherwise be permissible remedies under a valid § 502(a)(3) claim, *see CIGNA Corp. v. Amara*, 563 U.S. 421 at 444 (2011) ("a fiduciary can be surcharged under §502(a)(3) only upon a showing of actual harm—proved (under the default rule for civil cases) by a preponderance of the evidence")), the end result is the same—plaintiff is seeking money damages in the amount of the difference between the 80/80 Spouse's Annuity Option she seeking and the amount she is otherwise receiving.

There is no indication in the first amended complaint, or otherwise in plaintiff's response to defendants' motion to dismiss, that an order awarding plaintiff the 80/80 Spouse's Annuity Option damages amount retroactive from June 1, 2015 would not adequately remedy her claims. Thus, plaintiff's claim for monetary relief is merely a "repackaged" claim that would have been adequately remedied under § 502(a)(1)(B), and must be dismissed as it is barred under ERISA.

**B. Reformation of the Plan**

Plaintiff also seeks reformation of the Plan under § 503(a)(3):

- "Reform[ing] the Plan's procedures to eliminate any requirement that divorced participants who have not

submitted a domestic relations order submit a QDRO before applying for the benefits to which they are entitled;" and

- Estopping defendants from asserting that Mr. Powers' death is a bar to awarding the 80/80 Spouse's Annuity Option, retroactive to June 1, 2015.

(Dkt. 12 at 27.) "Reformation is the judicial reforming or re-writing of a document, such as a contract, to make the document reflect the true agreement of the parties." *Pearce v. Chrysler Group, LLC Pension Plan*, 893 F.3d 339 (6th Cir. 2018).

Even if she could bring these claims for relief under § 503(a)(1)(B), however, they are not permissible here, as plaintiff has not alleged mutual mistake or fraud. There are two situations where a contract may be reformed: (1) where there is a 'mutual mistake of both parties'; or (2) where one party is mistaken and the other commits fraud or engages in inequitable conduct." *Pearce*, 893 F.3d at 347 (citing cases). Plaintiff does not plead either situation. Therefore, plaintiff does not state a claim for relief under this cause of action.

Moreover, at the oral argument on this motion, counsel for plaintiff acknowledged that reformation of just one portion of the Plan alone would not provide plaintiff with the remedy she ultimately seeks— namely, the dollar amount she would have received if Mr. Powers had

16

enrolled in the 80/80 Spouse's Annuity Option in the manner required by the Plan. Accordingly, defendants' motion to dismiss is granted as to plaintiff's claims for reformation.

### C. Adherence to the Plan's Election Terms is Rational in Light of the Plan's Provisions

Finally, plaintiff argues that defendants' interpretation of the Plan was arbitrary and capricious and should be reversed to award plaintiff the 80/80 Spouse's Annuity Option. (Dkt. 12.)

As set forth above, the Plan vested defendants with considerable discretion to administer and construe its terms. (*See* Dkt. 12-2 at 93.) When a Plan administrator is vested with discretionary authority to determine eligibility and construe its terms, a denial of benefits claim is reviewed to determine if it is "arbitrary and capricious." *See Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 456 (6th Cir. 2003) (quoting case). If the administrator's decision is "rational in light of the plan's provisions" it must be upheld. *Borda v. Hardy, Lewis, Pollard & Page, P.C.*, 138 F. 3d 1062, 1066 (6th Cir. 1998) (quoting cases).

As discussed above, Mr. Powers' recorded access of BenefitsWeb, his handwritten notes from phone calls with defendants and their representatives, and his efforts to send defendants a copy of his divorce

17

decree indicate that he intended to retire on June 1, 2015, and that he also intended to elect the 80/80 Spouse's Annuity Option. In the end, however, he never submitted a valid QDRO or made an election on the proper form, which were prerequisites to exercising his benefits options.

This case is, in many respects, similar to *Strang v. Ford Motor Co. Gen. Ret. Plan*, 693 F. App'x 400 (6th Cir. 2017). In *Strang*, the defendant Ford began a new benefits system, and permitted employees to make elections during a period assigned by a random process. *Id.* at 401. Ford made it clear that no exceptions would be made to expedite or change an election period to allow members to elect benefits before their assigned period. *Id.* The plaintiff's husband was diagnosed with terminal cancer before his election period, so he sought to expedite his election period in order to ensure his wife would receive maximum benefits under the new plan after his death. *Id.* at 401–402. Ford refused to make an exception to its random process for selecting the election period, so the plaintiff's husband wrote defendant letters indicating which benefit election he sought. *Id.* at 402. The plaintiff's husband died before his assigned election period, and Ford denied the plaintiff's benefits because her

18

husband had not submitted a complete and valid election form during his election period. *Id.*

In *Strang*, then, the plaintiff sued, arguing that the letters her husband wrote should be considered his benefits election, and arguing that Ford's denial of benefits was arbitrary and capricious, but the Sixth Circuit disagreed. *Id.* at 404–05. The plan at issue clearly demarcated a fixed period for a retiree to elect an option, and contemplated the form on which elections must be made. *Id.* at 404. The plaintiff's husband's letter was not the proper form, nor was it submitted during his election period, thus denial was "rational in light of the plan's provisions." *Id.*

Similarly here, the Plan vests the defendants with authority and discretion to administer the Plan. (Dkt. 12-2 at 93.) It also provides that defendants had authority to make benefits conditional on its members submitting a duly executed and filed QDRO. (*Id.* at 73.) Finally, it requires that benefit elections be made on the Plan-approved form. (*Id.* at 53) It also specifies the timing under which such an election must be made before a desired Annuity Starting Date. (*Id.*) Defendants were not acting irrationally when they denied plaintiff benefits finding that Mr.

Powers had not made a proper election in accordance with these terms. (Dkts. 12-17 at 1; 12-19 at 1.)

This case presents a very sad and unfortunate set of facts. Receiving the 80/80 Spousal Annity Option would undoubtedly make a difference to plaintiff. However, the Court cannot reverse defendants' denial of benefits where defendants followed the terms of the Plan in doing so. In adhering to its own system, defendants' actions were not arbitrary. Defendants' decision to deny benefits to plaintiff is rational in light of the Plan's provisions. Accordingly, defendants' motion to dismiss under Rule 12(b)(6) is granted, as plaintiff has failed to state a claim that she is entitled to relief under § 502(a)(3).

## IV. Conclusion

For the reasons set forth above, the Court GRANTS defendants' motion to dismiss (Dkt. 15).

IT IS SO ORDERED.

Dated: February 11, 2019      s/Judith E. Levy
    Ann Arbor, Michigan      JUDITH E. LEVY
                                      United States District Judge